ASSET PURCHASE AGREEMENT

Dated August 16, 2011

Between

ERP-Link Corp., in anticipation of it becoming a
Debtor in the United States Bankruptcy Court for the District of Oregon,
as Seller

And

Gimmal Holdings LLC, as Buyer

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") dated as of August 16, 2011, is entered into between ERP-Link Corp., an Oregon corporation, in anticipation of it becoming a debtor in the United States Bankruptcy Court for the District of Oregon, as Seller ("Seller") and Gimmal Holdings LLC, a Texas limited liability company ("Buyer").

**WHEREAS**, Seller is engaged in the development and application of intellectual property relating to specialized computer software (the "Business");

**WHEREAS**, Seller has committed that, within two (2) Business Days after execution hereof (the date Seller actually files being hereinafter called the "Petition Date"), it will file a voluntary petition commencing a Chapter 11 Bankruptcy Case styled *In re ERP-Link Corp.,* Case No. _____ [to be assigned] (hereinafter, the "Bankruptcy Case") pursuant to Chapter 11 of Title 11 of United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court");

**WHEREAS**, Seller desires to sell its assets to Buyer and Buyer desires to purchase Seller's assets (the "Purchased Assets") upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions pursuant to section 363 of the Bankruptcy Code; and

**WHEREAS**, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitional and Interpretive Matters</u>. Unless otherwise expressly provided, for purposes of this Agreement, the definitions set forth on Annex I, attached hereto and incorporated herein, shall apply. Further, the following rules of interpretation shall apply:

(a)    <u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-business Day, the period in question shall end on the next succeeding Business Day. A "Business Day" means any day other than a Saturday, a Sunday or a national holiday.

(b)    <u>Dollars</u>. Any reference in this Agreement to $ shall mean U.S. dollars.

(c)    <u>Exhibits/Schedules</u>. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)    <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

(e)    <u>No Strict Construction</u>. The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Purchased Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase from Seller, and Seller shall sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered to Buyer, all of the Purchased Assets, free and clear of all Liens and Liabilities. The Purchased Assets are described more specifically in the Annex I attached hereto, where such term is defined, but shall specifically include, among other things:

    (i)    All of Seller's Intellectual Property; a list of Seller's Patents, Trademarks, and Copyrights is attached hereto as Schedule <u>2.1(a)(i)</u>;

    (ii)    All of Seller's computers, computer equipment and tangible property used with the Intellectual Property, including all computer hardware and software, furniture and office supplies;

    (iii)    All of Seller's computer domain names and customer lists;

    (iv)    All of Seller's accounts receivable, a general listing of which is attached hereto as Schedule <u>2.1(a)(iv)</u>; (with the final listing to include all accounts receivable existing as of the date of the Sale Order);

    (v)    At Buyer's option, an assignment of any unexpired leases of non-residential real property or equipment, provided however that such leases will be assumed with a cure amount of zero ($0.00) dollars unless cured prior to the Closing;

    (vi)    At Buyer's option, executory contracts relating to the Intellectual Property, including without limitation, all computer software licenses and service contracts, provided however that such contracts will be assumed with a cure amount of zero ($0.00) dollars unless cured prior to the Closing;

    (vii)    With respect to any assumed lease or executor contract, the counterparty must agree that the lease or contract is not subject to any uncured default at the time of Closing; and

(viii)    Warranties and rights under insurance policies covering any of the Purchased Assets.

(b)    Indivisible Transaction.  The sale of all of the Purchased Assets to Buyer constitutes a single, indivisible transaction and the Purchased Assets are intended to be sold to Buyer as a single, indivisible group of assets.

Section 2.2    No Assumption of Liabilities.

(a)    ANYTHING    CONTAINED    HEREIN    TO    THE    CONTRARY NOTWITHSTANDING, BUYER SHALL NOT AND BUYER DOES NOT ASSUME ANY LIABILITIES OF THE SELLER WHETHER OR NOT ARISING OUT OF OR RELATING TO THE ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF THE SELLER, ALL OF WHICH LIABILITIES SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF THE SELLER.

Section 2.3    Assumed Contracts and Assumed Leases.

(a)    Schedule 2.3 lists all Assumed Contracts and all Assumed Leases.  Buyer shall have, unless otherwise provided herein, until the entry of the Sale Order the right to designate which of Seller's Contracts and Leases it desires Seller to assume and assign to Buyer.  In all cases, appropriate additions and deletions to Schedule 2.3 shall be made to reflect such elections made by Buyer.  Seller will provide notice to each counterparty to a Contract or Lease proposed to be assumed that the Contract will be assumed pursuant to the provisions hereof, and provide each counterparty due notice of the opportunity to object to the terms of the assumption, or the terms of the assignment, of any such Contract or Lease prior to entry of the Sale Order.

(b)    With respect to each Assumed Contract and Assumed Lease, on or before the Closing Date Seller shall (i) assume such Assumed Contract or Assumed Lease in the Bankruptcy Case and (ii) subject to Seller paying any amounts designated in Schedule 2.3 as Cure Costs and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Assumed Contract or Assumed Lease to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order).  Buyer is to have no liability for any Cure Costs except any that Buyer elects to pay.  Effective on the Closing Date, Seller shall assign to Buyer each such Assumed Contract or Assumed Lease.  If, after the Closing Date, Buyer becomes aware of a Cure Cost which was not paid by Seller pursuant to this paragraph (b), then Seller shall pay such Cure Cost promptly after written notice from Buyer notifying Seller of such Cure Cost.

(c)    The Sale Order shall provide that, as of the Closing, Seller shall assign to Buyer each Assumed Contract and Assumed Lease.  At least seven (7) Business Days prior the filing of the Sale Motion, Seller shall identify any Leases, Contracts and other rights, property and commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of any third party.  Buyer shall be permitted to require Seller to obtain a signed certification from any counterparty to the effect that as of the date of assignment to Buyer, there are no uncured defaults or events which, with the giving of required notice or otherwise, might constitute an event of default.  To the extent that Buyer considers any such Leases and Contracts to be material, it may either negotiate a reduced price for the Purchased Assets, or if such negotiation is unsuccessful, terminate this Agreement.

Section 2.4    Further Assurances.

(a)    At the Closing, and at all times thereafter as may be necessary, upon the request of the Buyer, Seller shall, without further consideration, execute and deliver (or use its best efforts to have any applicable third party execute and deliver) such instruments of transfer and instruments of release as shall be reasonably necessary to vest in Buyer title to the Purchased Assets free and clear of all Liens and Liabilities. Seller and Buyer shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby. The Sale Order shall provide that the provisions herein shall bind any successor in interest of Seller, including, without limitation, any trustee at any time appointed or serving in the Bankruptcy Case, whether or not it is converted to a case under Chapter 7 of the Bankruptcy Code.

# ARTICLE III

# PURCHASE PRICE

Section 3.1    Purchase Price.    Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the aggregate purchase price to be paid by Buyer to the Seller in exchange for the Purchased Assets shall be as follows (the "Purchase Price"):

a)    $200,000.00, plus

b)    85% of the face amount of verified A/R under 60 days of invoice date, not to exceed $120,000 (the "A/R Price") for all of Seller's A/R. [Based on 7/19/11 balance sheet, that would yield an A/R Price of approximately $100,039]

When both parties have executed this Agreement, and Seller has filed its voluntary bankruptcy petition, Buyer shall deliver a good faith deposit of $20,000 to be held by counsel for Seller in trust until the Closing. The Buyer's deposit is to be applied toward Buyer's payment of the Purchase Price if Buyer is the successful purchaser, or unconditionally refunded to Buyer within five (5) Business Days after the Closing if Buyer is not for any reason the successful purchaser, or if there is no Closing on or before October 15, 2011 (unless extended by Buyer), then within five (5) Business Days after Buyer's written request.

At the Closing, Buyer shall make payment to Seller by wire transfer of immediately available funds to the account(s) designated by Seller or as otherwise provided in the Sale Order.

Section 3.2    Closing Date.    Upon the terms and conditions set forth in this Agreement, the closing of the sale of the Purchased Assets contemplated hereby (the "Closing") shall take place, as promptly as practicable, and at no time later than the fifth Business Day, following the date on which the Sale Order has become a Final Order.    The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

Section 3.3.    Seller's Deliveries.    At or prior to the Closing, Seller shall deliver to Buyer:

(a)    a bill of sale, in form and content reasonably satisfactory to Buyer (the "Bill of Sale"), duly executed by Seller, covering all of the Purchased Assets;

(b)     instruments of assignment of the Patents and Trademarks that are owned by Seller and included in the Purchased Assets, duly executed by Seller, in form and content reasonably satisfactory to Buyer and that satisfy any assignment requirements of the United States Trademark and Patent Office, and any other assignments or instruments with respect to any Seller Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer;

(c)     all files, documents, and electronically stored information in the possession of or controlled by Seller relating to the Intellectual Property;

(d)     all agreements of any sort between Seller and Employees or Former Employees relating to the Intellectual Property, whether relating to ownership, assignment, production, development, non-disclosure, non-competition, or otherwise;

(e)     to the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases and Assumed Contracts in form and content reasonably satisfactory to Buyer, duly executed by Seller, in form for recordation with the appropriate public land records, if necessary; and

(f)     to the extent in Seller's possession: (i) all lease files for the Assumed Leases, (ii) all contract files for the Assumed Contracts, and (ii) all keys and the combination of any equipment, machineries, safes, access codes for any electronic security.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

Section 4.1     Organization of the Seller. The Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, the state of Oregon, and qualified to do business in any jurisdiction where the Seller operates its business.

Section 4.2     Authority of Seller.

(a)     Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform its obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which Seller is a party. This Agreement, subject to the entry of the Sale Order, is the legal, valid and binding obligation of Seller enforceable in accordance with its terms, and each of the Ancillary Documents to which Seller is a party has been duly authorized by Seller and upon execution and delivery by Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of Seller enforceable in accordance with its terms in each case.

(b)     Neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under: (i) Seller's articles of organization or operating agreement; (ii) any Legal Requirement affecting Seller; or (iii) any Contract or Lease to which Seller is a party or by which Seller is bound.

(c)     The Purchased Assets are not subject to any right or option to purchase, right of first purchase, right of first refusal, or other right, option or agreement affecting or limiting Seller's full right to sell the Purchased Assets.

Section 4.3     Title to Purchased Assets.  Seller has, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated herein, as authorized by the terms of the Sale Order, Seller will thereby transfer to Buyer, good and marketable title to, or, in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Purchased Assets free and clear of all liens, claims, interests, and encumbrances, including without limitation, free and clear of the Liens and Liabilities.  Upon request of Buyer, Seller shall assign to Buyer all or any agreements executed between Seller and all Employees or Former Employees, so as to assign to Buyer all rights in Seller's Intellectual Property at any time produced or developed by the Employees or Former Employees while employed at Seller, including, at Buyer's election, each agreement of any sort between Seller and Employees or Former Employees relating to the Intellectual Property, whether relating to ownership, assignment, production, development, non-disclosure, non-competition, or otherwise.

Section 4.4     Intellectual Property Assets.  Seller has listed on Schedule 2.1(a)(i) all of Seller's Intellectual Property and, upon delivery to Buyer on the Closing Date of the instruments of transfer and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer good and marketable title to, or, in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of Seller's Intellectual Property, free and clear of all liens, claims, interests and encumbrances, including, without limitation, free and clear of the Liens and Liabilities.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

Section 5.1     Organization and Authority of Buyer.

(a)     Buyer is duly organized, validly existing and in good standing under the laws of the state of Texas.  Buyer has full limited liability company power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is a party, respectively.  This Agreement has been duly authorized, executed and delivered by Buyer and, subject to the entry of the Sale Order, is the legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

(b)     Neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will: conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (i) Buyer's articles of organization or operating agreement, (ii) any Order to which Buyer is a party or by which it is bound, or (iii) any Legal Requirement affecting Buyer.

Section 5.2     No Finder.  Neither Buyer nor any Person acting on their behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable.

## ARTICLE VI

## COVENANTS

Section 6.1     Information Regarding the Business.

(a)     Seller will, to the extent practicable (i) provide Buyer and its officers, employees, counsel, accountants, partners, affiliates, financial advisors, consultants and other representatives (collectively, "Representatives") with reasonable access, upon reasonable prior notice and during normal business hours, to the Employees and officers and agents of the Seller who have any responsibility for the conduct of the Business, and to the Purchased Assets, and (ii) furnish the Representatives with such information and data (including copies of Contracts, Permits, Leases and other books and records and access to the Computers and the data stored thereon) concerning the Business, the Purchased Assets and the Assumed Liabilities as the Representatives reasonably may request in connection with such investigation, except to the extent that furnishing any such information or data would violate any Law, Order, Contract or license applicable to Seller or by which any of its assets and properties is bound.

Section 6.2     Contact with Customers, Vendors and Employees.  Subject to applicable Law, Seller shall use its commercially reasonable efforts to facilitate Buyer's contact and communication with Employees and customers, suppliers, vendors and distributors of the Business of the Seller, as requested by Buyer at any time from and after the execution of this Agreement.

Section 6.3    <u>Required Consents</u>.  Seller will, before and after the Closing Date, use its commercially reasonable efforts to obtain or cause to be obtained any Required Consents that are requested by Buyer and that have not been previously obtained prior to or at the Closing, and Buyer shall provide its cooperation in such regard if reasonably requested by Buyer.  Seller shall cooperate in any reasonable arrangement which is designed to provide Buyer with the benefits of such Required Consent until such time the Required Consent is actually obtained by Seller.

Section 6.4    <u>Conduct of Business Prior to the Closing Date</u>.  During the period from the date hereof through and including the Closing Date, except as consented to in writing by Buyer or as required by this Agreement, Seller shall operate the Business only in the Ordinary Course of Business.  During the period from the date hereof through and including the Closing Date, Seller shall use its commercially reasonable best efforts to: (i) preserve intact the Business and the business organization of Seller; (ii) maintain in effect all approvals from Governmental Authorities which are necessary or useful for the operation and management of the Business; (iii) maintain, preserve and keep the Purchased Assets in reasonable condition and repair (ordinary wear and tear excepted); and (iv) maintain good business relationships with customers, suppliers, licensors, lessors and others having substantial dealings with the Business.

Section 6.5    <u>Insurance</u>.  Until the Closing, Seller shall maintain (including necessary renewals thereof) Insurance Policies against risk and liabilities to the extent and in the manner and at the levels maintained by Seller as of the date hereof with respect to the Business and the Purchased Assets.  If requested by Buyer, Seller shall in good faith cooperate with Buyer and take all actions reasonably requested by Buyer that are necessary or desirable to permit Buyer to have available to it following the Closing the benefits (whether direct or indirect) of the Insurance Policies maintained by or on behalf of Seller with respect to the Business including, but not limited to, taking those actions which may be necessary to assign the Insurance Policies to Buyer.

<h3 style="text-align:center">ARTICLE VII</h3>

<h3 style="text-align:center">BANKRUPTCY MATTERS</h3>

Section 7.1    Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and (ii) Seller must pay the Cure Costs and cure all defaults and provide adequate assurance of future performance under the Assumed Contracts and Assumed Leases.  Further, the Seller and Buyer acknowledge that the Bankruptcy Court may, but is not required to, order an auction process for the sale of the Purchased Assets.

Section 7.2    Seller has filed or will within two (2) Business Days file with the Bankruptcy Court a motion (the "Sale Motion"), notices and proposed orders, in form and

Page 8 of 19

content reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of the sale order (the "Sale Order"). The Sale Motion shall include a request that the Sale Order include, among other things:

    (a) that this Agreement was negotiated at arms-length, the Buyer has acted in good faith, and without collusion or fraud of any kind;

    (b) the Buyer is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code;

    (c) neither the Seller nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

    (d) Buyer is purchasing the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by section 363(m) of the Bankruptcy Code;

    (e) notice of the sale (and any required sale procedures), as sent to all creditors and interested parties, is sufficient to comply with notice requirements of the Bankruptcy Code;

    (f) all objections to the sale free and clear of liens, claims, interests and encumbrances have been withdrawn or overruled, and the Buyer therefore purchases the Purchased Assets free and clear of all liens, claims, interests and encumbrances, including free and clear of the Liens and Liabilities; and

    (g) Buyer is released from any potential liability in connection with the purchase of the Purchased Assets.

        Section 7.3    Seller shall serve a copy of the Sale Motion on: (i) all entities that claim any interest in or Lien upon the Purchased Assets; (ii) all parties to Assumed Contracts and Assumed Leases; (iii) all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have claims, contingent or otherwise, against the Seller; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all creditors or holders of claims (as defined in section 101(5) of the Bankruptcy Code, whether or not liquidated, contingent, disputed, or unmatured) of the Seller; (vi) all interested governmental, pension, environmental and other regulatory entities; (vii) the attorney general of the State of Oregon; (viii) the Office of the United States Trustee; (ix) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Seller; (x) all entities that expressed to the Seller an interest in purchasing the Purchased Assets and (xi) all parties to Contracts and Leases.

        Section 7.4    Seller shall use its reasonable best efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders) directly relating to the Purchased Assets or this Agreement prior to the filing thereof in the Bankruptcy Case so as to allow Buyer to provide reasonable comments for incorporation into same.

        Section 7.5    The Seller has filed or will within two (2) Business Days file with the Bankruptcy Court a motion seeking approval of a bidding process ("Bidding Procedures

Motion"). The Bankruptcy Court order approving such bidding process ("Bidding Procedures Order") shall include the following, without limitation:

(a)    If Buyer is not, for any reason, the successful purchaser, Buyer will be entitled to payment of $40,000.00, previously paid by Buyer to Seller in connection with the bankruptcy sale of the Purchased Assets, as a break-up fee;

(b)    Competing bidders will be required to pay the $40,000.00 break-up fee and overbid in $20,000.00 increments above the bid submitted by the Buyer; Buyer shall have the right but not the obligation to overbid competing bids by the same $20,000.00 increment;

(c)    Competing bidders must demonstrate the ability to pay the purchase price in cash at the Closing;

(d)    Competing bidders (other than the Buyer) will be required to deposit $60,000.00 cash, and deliver to Seller a signed copy of this Agreement on the same or better terms, modified only as to the amount of the purchase price, and the identity and contact information of the competing bidder, in order to confirm a commitment to proceed with the purchase; and

(e)    If the Buyer is the successful purchaser, then the Sale Order shall contain, among other things, the provisions set forth above in Section 7.2.

Section 7.4  In the event Seller does not file a petition under Chapter 11 of Title 11 of the United States Code and file and serve, as specified herein, the Sale Motion and Bidding Procedures Motion, requesting issuance of the Sale Order and Bidding Procedures Order: (A) Establishing Notice and Bidding Procedures in Connection With a Contemplated Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Buyer; and (B) Scheduling an Auction, within two (2) Business Days after Seller's receipt of a signed copy of this Agreement, Buyer may upon written notice to Seller cancel this Agreement with no obligation or liability on the part of Buyer whatsoever.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

Section 8.1    Taxes.

(a)    Seller shall be liable for and shall pay or reimburse Buyer for all Taxes (whether assessed or unassessed) applicable to the Purchased Assets attributable to time periods ending on or prior to the Closing Date ("Pre-Closing Taxes"). Buyer shall be liable for and shall pay all Taxes (whether assessed or unassessed) applicable to the Purchased Assets attributable to time periods beginning after the Closing Date ("Post-Closing Taxes"). For purposes of this subparagraph (a), any period beginning before and ending after the Closing Date (a "Straddle Period") shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date and items of income, gain, deduction, loss or credit, and state and local apportionment factors for the Straddle Period shall be allocated between such two partial periods on a "closing of the books basis" by assuming that the books of the Person

subject to such Tax were closed at the close of the day on the Closing Date; provided, however, that exemptions, allowances or deductions that are calculated on an annual basis (such as the deduction for depreciation), and Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)     Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order ("Transfer Taxes") shall be borne by Seller.  Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes.

Section 8.2    No Successor Liability to Employees.    Under no circumstances shall Buyer assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any Liabilities of the Seller's Employees, including any Liabilities related to Benefit Plans, employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, Liability under the WARN Act, salaries, vacations (except for accrued vacation pay, subject to the limitations provided in Section 8.3), sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), which Employee Claims shall be and remain the Liability of Seller.

Section 8.3    Employment.

(a)     Prior to the Closing Date, Seller shall terminate the employment of all Employees. Buyer may (but shall not be required to), in its sole and absolute discretion, offer employment to any and all individuals employed, or formerly employed, by Seller in connection with the Business to commence immediately following the Closing, each such offer contingent upon the issuance of the Sale Order of the Bankruptcy Court and the Closing.  Buyer's employment of any individuals previously employed by Seller shall be on an "at will" basis and on such other terms and conditions of employment as Buyer shall offer in its sole discretion.  Except as otherwise agreed to in writing, Buyer shall be under no obligation to employ or continue to employ any individual for any period.  Employees or Former Employees who accept Buyer's offer of employment and who commence employment with Buyer from and after the Closing Date shall be referred to herein as the "Hired Employees."  Under no circumstance shall any individual employed or formerly employed by Seller become an employee of Buyer unless such individual becomes a Hired Employee.

(b)     With respect to each Hired Employee, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment, activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign to Buyer Seller's rights to all obligations of each Hired Employee not to disclose confidential information relating to the

Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(c)      Nothing herein, express or implied, shall confer upon any Employee or former employee of the Seller any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any Employee or former employee of the Seller.

(d)      Seller shall retain all Liabilities arising out of the termination of any of Employees who are not Hired Employees, including: (i) compliance with the requirements of the WARN Act or under any similar or analogous Legal Requirement having applicability to Seller or the Business: (ii) administration and payment of severance benefits, and if provided, out placement assistance; (iii) accrued salary, vacation and benefits or other payments, whether or not payable under Contract; (iv) providing COBRA benefits under applicable Legal Requirements; and (v) any other related Liabilities.

(e)      Seller shall prevent any and all actions and omissions to act which would directly or indirectly give rise to any Liabilities on the part of Buyer (or any group health plan relating to Buyer): (i) as or in relation to a "successor employer" under COBRA or applicable Legal Requirements in connection with the transactions contemplated by this Agreement or any group health plan relating to Seller or any of its Affiliates; or (ii) in connection with any Benefit Plan.

(f)      Within ten Business Days of the date hereof, Seller shall deliver to Buyer: (i) a loss history for Seller's health insurance for the 24 months prior to the date hereof; and (ii) a detailed report of any individual health insurance claim by an Employee or former employee of Seller which exceeded $15,000.00 for the 12 month period prior to the date hereof. Notwithstanding anything contained in this Agreement to the contrary, Seller shall not be required to provide any information which would violate HIPAA or any other Legal Requirements related to privacy of medical records.

Section 8.4      Adequate Assurances Regarding Assumed Contracts and Assumed Leases. With respect to each Assumed Contract and each Assumed Lease, Seller and Buyer will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assumed Contract and Assumed Lease. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

Section 8.5      Cure Amounts.  Set forth on Schedule 2.3 is a list of the costs: (i) that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of

the Seller under the Assumed Contracts and Assumed Leases, which costs must be delivered to the nondebtor under the Assumed Contracts and Assumed Leases, or with respect to which adequate assurance of prompt delivery by Seller must be provided as a prerequisite to the assumption of such Assumed Contracts and Assumed Leases under Bankruptcy Code Section 365(a); (ii) that will be necessary to keep the Seller current on any payments due under any Assumed Contract or Assumed Lease as of the Closing Date (the "Cure Costs"). Prior to the Closing, Buyer shall cooperate with Seller to resolve any disputes with the nondebtor party to any of the Assumed Contracts or Assumed Leases regarding the amount of the Cure Costs. Subject to entry of the Sale Order and it becoming a Final Order, Seller shall pay the Cure Costs designated in accordance with the terms and conditions of any Order approving the assumption and assignment of the Assumed Contracts.

## ARTICLE IX

## CONDITIONS TO CLOSING

Section 9.1    Conditions to Obligations of Buyer. The obligation of Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Buyer) on or prior to the Closing Date of the following additional conditions:

(a)    the representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than any such representations and warranties that address matters only as of a particular date, which shall be true and correct as of such date);

(b)    in the Buyer's sole determination as to sufficiency, a sufficient number of Seller's Employees shall commit to Buyer to become Hired Employees as of the Closing Date; in this connection the Seller acknowledges that the ability of the Buyer to hire the Hired Employees is both material and integral to the proposed purchase of the Purchased Assets, that the value of the Purchased Assets is significantly diminished without such Hired Employees, and that Buyer would not enter into this Agreement or consummate the purchase of the Purchased Assets but for the hiring of the Hired Employees;

(c)    each covenant and obligation that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects;

(d)    the Sale Order shall have been entered, shall contain, among other things, the provisions set forth above in Section 7.2, and shall have become a Final Order;

(e)    each of the deliveries required to be made to Buyer pursuant to Section 3.6 shall have been so delivered;

(f)     subject to Section 2.3(d), all Required Consents for the transactions contemplated by this Agreement, shall have been obtained in form and content reasonably satisfactory to Buyer and its counsel and shall remain in full force and effect as of the Closing Date;

(g)     no event shall have occurred which has had or will have a material adverse effect on the Purchased Assets.

Any condition specified in this Section 9.1 may be waived by Buyer; provided that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

Section 9.2     Conditions to Obligations of Seller. The obligation of Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Seller) on or prior to the Closing Date of the following additional conditions:

(a)     the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all material respects as of such date);

(b)     each covenant and obligation that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects;

(c)     Buyer shall have delivered the Purchase Price to Seller or as otherwise directed by the Sale Order; and

(e)     the Sale Order shall have been entered.

Any condition specified in this Section 9.2 may be waived by Seller; provided that no such waiver shall be effective against Seller unless it is set forth in a writing executed by the Seller.


## ARTICLE X

## TERMINATION

Section 10.1     Termination. Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time prior to the Closing Date and in no other manner:

(a)     By mutual written consent of Buyer and Seller.

(b)    By Buyer upon five Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 9.1 is not timely satisfied or becomes impossible (other than through the breach by Buyer of any of its representations or warranties or the failure of Buyer to perform any of its obligations pursuant to this Agreement) and Buyer shall not have waived such condition in writing at or prior to the Closing Date.

(c)    By Seller upon five Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 9.2 is not timely satisfied or becomes impossible (other than through the breach by Seller of any of their representations or warranties or the failure of Seller to perform any of their obligations pursuant to this Agreement) and Seller shall not have waived such condition in writing at or prior to the Closing Date.

(d)    By Buyer, immediately upon the occurrence of any of the following events:

(i)    The Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(ii)    The Sale Order is not entered on or before September 20, 2011; or

(iii)    The Closing does not occur on or before October 15, 2011.

(e)    By either Party, provided the terminating party is not in default of its obligations under this Agreement, if the Closing shall not have occurred for any reason within thirty days after the entry of the Sale Order.

(f)    By either Party if a Governmental Authority issues a final and non-appealable Order prohibiting the transactions contemplated by this Agreement.

Section 10.2    Effect of Termination.  In the event this Agreement is terminated pursuant to Section 10.1, all further obligations of the parties hereunder shall terminate, except for Article XII.

## ARTICLE XI

## INDEMNIFICATION

Section 11.1    No Survival of Representations, Warranties, Covenants and Agreements. The representations, warranties, covenants and agreements contained in this Agreement shall not survive beyond the Closing Date, and there shall be no Liability in respect thereof, whether such Liability has accrued prior to the Closing Date or after the Closing Date, on the part of either party or its officers, directors, employees, agents and Affiliates; provided, however, that all covenants and agreements, which, by their terms, contemplate performance after the Closing Date, shall survive in accordance with their terms.

## ARTICLE XII

## GENERAL PROVISIONS

Section 12.1 <u>Confidential Nature of Information</u>. Each Party agrees that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the other Party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents. No Party shall use any confidential information referred to in the second immediately preceding sentence in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets and the enforcement of its rights hereunder and under the Ancillary Documents; provided, however, that after the Closing, Buyer may use or disclose any confidential information included in the Purchased Assets and may use or disclose other confidential information that is otherwise reasonably related to the Business or the Purchased Assets. The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information that (i) is or becomes available to such Party from a source other than the disclosing Party, provided such other source was not, and such Party would have no reason to believe such source was, subject to a confidentiality obligation in respect of such information, (ii) is or becomes available to the public other than as a result of disclosure by such Party or its agents, (iii) is required to be disclosed under applicable law or judicial process, including the Bankruptcy Case, but only to the extent it must be disclosed, or (iv) such Party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

Section 12.2 <u>Notices</u>. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) one Business Day after the date when sent to the recipient by reputable express courier service (charges prepaid), or (c) seven Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via facsimile, on the date of the transmission of the facsimile, provided that the sender thereof receives written confirmation that the facsimile was successfully delivered to the intended recipient. Such notices, demands and other communications shall be sent to Seller and to Buyer at the addresses indicated below:

If to Seller, to:

> ERP-Link Corp.
> 510 SW 5th Ave, Suite 200
> Portland, OR 97204
> Attn: Eric Anderson
> Facsimile: _____

with a copy to (which shall not constitute notice):

Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205
Attn:  Howard M. Levine
        David D. VanSpeybroeck
P: 503.227.1111 | D: 503.972.4254
F: 503.248.0130 | C: 503.702.4214

If to Buyer, to:

Gimmal Holdings LLC
24 Greenway Plaza, Suite 1000
Houston, Texas 77046
Attn:  Mike Alsup, Sr. Vice President
Phone: 713.586.6542
Fax: 713.586.6501

with a copy to (which shall not constitute notice):

Shannon, Martin, Finkelstein & Alvarado, P.C.
1001 McKinney Street, Suite 1100
Houston, TX 77002
Attn:  Mark S. Finkelstein
Phone: 713.646.5503
Fax: 713.752.0337

or to such other address or facsimile number as such party may indicate by a notice delivered to the other party hereto.

Section 12.3   Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.  The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise).  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this any right, remedy or claim under or by reason of this Agreement.

Section 12.4   Entire Agreement: Amendments; Disclosure Schedules.  This Agreement, the Ancillary Documents and Disclosure Schedules referred to herein contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto with respect to such subject matter.  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by the Buyer and Seller.

Section 12.5 <u>Waivers</u>. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by an instrument in writing executed by the party or parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party. Except as otherwise provided herein, the failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 12.6 <u>Expenses</u>. Each Party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

Section 12.7 <u>Partial Invalidity</u>. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 12.8 <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile (or other electronic means of transmission) shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.9 <u>Governing Law and Dispute Resolution</u>.

(a)     This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of Texas and the Bankruptcy Code, to the extent applicable.

(b)     During the pendency of the Bankruptcy Case, any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and each of the parties consents to the

jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

Section 12.10 <u>No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

BUYER:

Gimmal Holdings LLC

By: _____

Name: Mike Alsup

Title: Sr. Vice President


SELLER:

ERP-Link Corp.

By: _____

Name: Eric Anderson

Title: President

## ANNEX 1

## **DEFINITIONS**

"Accounts Receivable" means all accounts receivable and other rights to payment of Seller and the full benefit of all security for such accounts receivable or rights to payment, including, but not limited to, all accounts receivable in respect of goods shipped or products sold or services rendered to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing.

"Agreement" has the meaning specified in the preamble.

"Alternative Transaction" means any one of the following transactions with or by a Third Party resulting in the sale of the Business: (a) the sale of the Purchased Assets by the Seller to a buyer other than the Buyer, through a bankruptcy competing bid process or otherwise, including by a merger, consolidation or similar transaction involving the Seller, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Seller constituting a majority of the consolidated assets of Seller.

"Ancillary Documents" means a Bill of Sale, the Assumption and Assignment Agreement, and an Assumption and Assignment of Leases, each in form and content reasonably satisfactory to Buyer, and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Assumed Contracts" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Leases" has the meaning specified below in the definition of "Purchased Assets."

"Bankruptcy Case" has the meaning specified in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code 11 U.S.C. Sections 101 et. seq.

"Bankruptcy Court" has the meaning specified in the recitals.

"Benefit Plan" means any benefit plans provided by the Seller to any Employee.

"Bill of Sale" shall have the meaning set forth in Section 3.3(a).

"Business" has the meaning specified in the recitals.

"Business Day" has the meaning specified in Section 1.1(a).
"Buyer" has the meaning specified in the preamble.

1

"Claim" means a claim against the Seller as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning specified in Section 3.2.

"Closing Date" has the meaning specified in Section 3.2.

"COBRA" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"Computers" means all computer equipment and hardware, including all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto, together with all Intellectual Property used in connection with the operation of such computer equipment, including all Software and rights under any licenses related to such use.

"Contract" means any agreement, contract, obligation, promise, instrument, undertaking, understanding or other arrangements (whether written or oral), and any amendment thereto, that is legally binding, other than a Lease, to which any Seller is party.

"Copyrights" means all U.S. and common law works of authorship and copyrightable subject matter, and copyrights, whether registered or unregistered, copyright registrations and applications therefor, all rights to register and obtain renewals and extensions of copyright registrations, and all other rights corresponding to any of the foregoing throughout the world, including "moral" rights.

"Documents" means all books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists (provided, however, that any customer lists may exclude customers' social security and/or credit card numbers), cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers, and all records, notes, and documents relating to any Software (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties, including the Seller Intellectual Property, business or operations of the Business.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.

"Employee" means any full- or part-time employee or independent contractor of Seller as of the date of this Agreement.

2

"Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which Seller have an interest and used in the Business.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means all assets of Seller not identified as being part of the Purchased Assets.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Former Employee" means any full- or part-time employee or independent contractor formerly employed by Seller that is not a current Employee as of the date of this Agreement

"GAAP" means generally accepted accounting principles employed in the United States, as consistently applied.

"Governmental Agency" or "Governmental Authority" means (a) any international, foreign, federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction, or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"Hired Employees" has the meaning specified in Section 8.3(a).

"Insurance Policies" means insurance policies of the Seller as of the date hereof.

"Intellectual Property" means all of the following:

(a)    all Trademarks;

3

(b)  all Patents;

(c)  all Copyrights;

(d)  all inventions (whether patentable or not), invention disclosures, discoveries, and improvements (which shall include, but not be limited to new findings, discoveries, techniques, works, processes and modifications developed by, owned by, or with rights held by, the Seller);

(e)  all Trade Secrets;

(f)  all industrial designs and any registrations and applications therefor throughout the world;

(g)  all databases and data collections and all rights therein throughout the world;

(h)  all Software and computer programs;

(i)  licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)  books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)  research and development materials relating to any of the categories of items specified in this section;

(l)  files and documents, including electronically stored data, relating to any of the categories of items specified in this section;

(m)  "know-how" and information relating to the any of the above categories of items specified in this section, including valuable technical knowledge, data, indices, drawings and other technical information, developed and owned or legally acquired and in the possession of the Seller, which is unknown to the public as of the effective date of this Agreement, and for which due protection measures have been taken by the Seller to keep the information secret from the public or competitors;

(n)  all other intellectual property rights and proprietary rights relating to any of the foregoing, including all intellectual property rights and proprietary rights relating to work developed or produced by any Employee or Former Employee while working for Seller; and

(o)  all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

4

"<u>Legal Requirement</u>" means any federal, state, provincial, local, municipal, foreign, international, multinational, judicial or other administrative Order, constitution, law, ordinance, principle of common law, rule, code, regulation, statute or treaty.

"<u>Liability</u>" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"<u>Lien</u>" means, with respect to any asset: (a) charge against or interest in property to secure payment of a debt or performance of an obligation; (b) mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, interest, charge, claim (as defined in section 101(5) of the Bankruptcy Code); (c) interest of any co-owner, whether as tenant in common, joint tenant, or tenant by the entirety, or by virtue of any other ownership interest, equitable interest, conditional sale or other title retention device or arrangement, occupancy agreement, license, lease or sublease, or security interest in, on, to or of such asset, or any option, right of use, right of first offer or right of first refusal, easement, servitude, restrictive covenant, encroachment, or other similar restriction of any kind, including, without limitation, any interest that is in bona fide dispute or as to which the party claiming such interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction therefor; (d) the interest of a vendor or a lessor under any conditional sale agreement, security or consignment agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; and (e) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Order</u>" means any decree, writ, assessment, award, decision, injunction, judgment, order, ruling, subpoena, verdict or arbitration award entered, issued, made, or rendered by any Governmental Agency or Governmental Authority.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of Seller in the ordinary and usual course) through the date hereof, consistent with the past practice of the Seller.

"<u>Party</u>" or "Parties" means, individually or collectively, each Buyer and Seller.

"<u>Patents</u>" means (a) patent rights, inventions, discoveries and invention disclosures (whether or not patentable) and (b) U.S. and foreign patents (including certificates of invention and other patent equivalents), utility models, and applications for any of the foregoing, including provisional applications, and all continuations, and continuations-in-part, divisionals, reissues, re-examinations, renewals, and extensions thereof or related thereto, and all applications or counterparts in any jurisdiction pertaining to the any of the foregoing.

5

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which are necessary or required for Seller to own, lease and operate their properties and assets or to carry on the Business as it was or is now being conducted or as is presently intended to be conducted.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals.

"Proceeding" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Products" means any and all products and services, and related documentation, currently or previously researched, designed, developed, manufactured, sold, leased, licensed, delivered, distributed, installed, or otherwise made commercially available by or on behalf of a Seller and used in the Business.

"Purchase Price" has the meaning specified in Section 3.1.

"Purchased Assets" shall mean all of the following properties and assets of the Seller:

(a)    any customer lists or other customer data maintained or collected by Seller used in the Business to the extent, and only to the extent, not prohibited to be transferred by order of the Bankruptcy Court (provided, however, that any such customer lists may exclude customers' social security and/or credit card numbers);

(b)    the right to receive and retain the Seller's mail and other communications relating to the Business;

(c)    all Equipment;

(d)    all Contracts listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (the "Assumed Contracts");

(e)    all leases, leasehold interests and leasehold improvements pertaining to the lease of any real property ("Leased Real Property") listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (such Leases, the "Assumed Leases");

(f)    all Permits and pending applications therefor;

6

(g)    all of Seller's Intellectual Property;

(h)    all Products, including all products in development by the Seller;

(i)    to the extent permitted by applicable law, all Documents except those (i) relating solely to any Excluded Asset; or (ii) relating to employees of Seller who are not Hired Employees;

(j)    all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business;

(k)    all of Seller's Accounts Receivable;

(l)    inventories of raw materials, work-in-process, finished goods, spare parts, supplies, products under research and development, and other accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at customers' or suppliers' premises on consignment, in each case, which are used by any Seller in the conduct of the Business, and expressly including the work in progress performed for all parties;

(m)    all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset;

(n)    all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(o)    any proprietary or licensed rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists (provided, however, that any customer lists may exclude customers' social security and/or credit card numbers), mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Seller Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(p)    all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business;

(q)    all rights of Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with former employees of Seller, agents of Seller or with third parties.

"Required Consents" means each consent, waiver, authorization or approval of any governmental or regulatory authority, domestic or foreign, or of any other Person, and each declaration to or filing or registration with any such governmental or regulatory authority, that is

7

required in connection with the execution and delivery of this Agreement and the Ancillary Documents by the Seller or the performance by the Seller of its obligations thereunder, including the consent of any landlords for the assignment and assumption of any Assumed Lease.

"Sale Motion" has the meaning set forth in Section 7.2.

"Sale Order" has the meaning set forth in Section 7.2.

"Seller" has the meaning specified in the preamble.

"Software" means all computer software (whether in source code, object code, or other form), including firmware, development tools, files, records, specifications, and data, all media on which any of the foregoing is recorded; and all systems, databases and platforms owned, licensed or used by a Seller, including all compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing, including all documentation and tools reasonably necessary for a skilled programmer to maintain, modify, and create derivative works of the applicable Software.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to Taxes of any other Person, and including all interest and penalties thereon and additions thereto; (ii) any liability in respect of any items described in clause (i) above arising as a result of being a member of a combined, consolidated, unitary or affiliated group of which the Seller (or any predecessor) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar provision of state, local or foreign laws; and (iii) any and all Taxes referenced in clauses (i) and (ii) hereof of any Person (other than the Seller) imposed on the Seller (x) as a transferee or successor, (y) by Contract or Law or (z) otherwise, which Taxes relate to an event occurring prior to or on the Closing Date.

"Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Third Party" means any Person or group other than Buyer, Seller and their respective Affiliates.

8

"Trademarks" means all trademarks, service marks, trade and business names (including all assumed or fictitious names under which the Business is conducted), brand names, trade dress, designs, logos, packaging design, slogans, Internet domain names and other commercial symbols in any and all forms, whether registered or unregistered, all registrations and pending applications to register any of the foregoing (including intent to use applications), throughout the world.

"Trade Secrets" means rights in all confidential, non-public, or proprietary information, including, ideas, research and development, know-how, trade secrets, processes, formulae, compositions, processes, technology, methodologies, blueprints, drawings, schematics, flow charts, models, prototypes, testing procedures and results, specifications, designs, plans, concepts, ideas, inventor's notes, invention disclosures, algorithms, techniques, technical data, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals formulae, and customer lists (provided, however, that any customer lists may exclude customers' social security and/or credit card numbers), all documentation relating to any of the foregoing, and the right in any jurisdiction to limit the use or disclosure thereof.

"WARN Act" means The Worker Adjustment and Retraining Notification Act of 1988, as amended, and the relevant rules and regulations promulgated thereunder.

9

**Schedule 2.3**
**Executory Contracts and Unexpired Leases to be Assumed and Assigned**

**[To Be Attached]**

| Name | Address1 | Address2 | City | State | Zip | Country | Description |
|------|----------|----------|------|-------|-----|---------|-------------|
| 5280 Solutions LLC | 8740 Lucent Blvd Suite 400 | | Highlands Ranch | CO | 80129-0000 | | Bi-Lateral Non-Disclosure Agreement |
| 5th & Washington, LLC | ATTN: Bruce Wood | 510 SW 5th Ave | Portland | OR | 97201-0000 | | Office Space Lease |
| Abb Inc. | 16250 W Glendale Drive | | New Berlin | WI | 53151-0000 | | Confidentiality Agreement |
| Aditi | 2002 156th Ave NE | | Bellevue | WA | 98007-0000 | | Master Service Agreement |
| AgilePoint, Inc. | 1916C Old Middlefield Way | | Mountain View | CA | 94043-0000 | | Partner Agreements |
| Algonquin Group | 556 S. Fair Oaks Ave | Suite 101-448 | Pasadena | CA | 91105-0000 | | Sub Contractor Professional Services Agreement |
| Aptar Group | 340-B Commerce Drive | | Crystal Lake | IL | 60114-0000 | | Annual Software License Agreement |
| Ascentn | 1916 C Old Middlefield Way | | Mountain View | CA | 94043-0000 | | Non-Disclosure Agreement |
| Aster Group, Inc | 434-B Cooperfied Blvd NE | | Concord | NC | 28025-0000 | | Partner Agreement |
| Avance Capital1 | 3838 Tamiami Trail N | Suite 416 | Naples | FL | 34103-0000 | | Confidentiality Agreement |
| Avnet Client Solutions | 14 Joyce Way | Parkwest Business Park | Dublin 12, Ireland | | | | Non-Disclosure Agreement |
| Baker & McKenzie Global Servic | 130 East Randolph St | Suite 3600 | Chicago | IL | 60601-0000 | | Mutual Confidentiality and Non-Disclosure Agreement |
| Blue Granite, Inc | 4664 Campus Drive | | Kalamazoo | MI | 49008-0000 | | Premier Partner Agreement |
| Blum Shapiro Consulting, LLC | 29 S Main Street | PO Box 27200 | West Hartford | CT | 06127-2000 | | Premier Partner Agreement |
| Borg Warner | 3850 Hamlin Road | | Ann Arbor | MI | 48326-0000 | | Annual Software License Agreement |
| BP Corporation of N.A. Inc. | PO Box 22024 | | Tulsa | OK | 74121-0000 | | Software Support Agreement |
| BP Corporation of N.A. Inc. | PO Box 22024 | | Tulsa | OK | 74121-0000 | | Software License Agreement |
| Calgon Carbon | PO Box 717 | | Pittsburgh | PA | 15230-0000 | | Software Support Agreement |

| Company | Address | City/Location | State | Zip | Agreement Type |
|---|---|---|---|---|---|
| Calgon Carbon | PO Box 717 | | Pittsburgh | PA | 15230-0000 | Software License Agreement |
| Cardian BCT | 10811 W Collins Ave | | Lakewood | CO | 80215-0000 | Annual Software License Agreement |
| Cardian BCT | 10811 W Collins Ave | | Lakewood | CO | 80215-0000 | Professional Services Agreement |
| Ceradyne, Inc. | 3169 Red Hill Avenue | | Costa Mesa | CA | 92626-0000 | Annual Software License Agreement |
| Christopher Kruell | PO Box 10061 | | Portland | OR | 97296-0000 | Sub Contractor Professional Services Agreement |
| Coca Cola Bottling Co. | Consolidated | 115 Coca Cola Plaza | Charlotte | NC | 28211-0000 | Annual Software License Agreement |
| ConocoPhillips Company | PO Box 2200 | | Bartlesville | OK | 74005-0000 | Software Support Agreement |
| ConocoPhillips Company | PO Box 2200 | | Bartlesville | OK | 74005-0000 | Software License Agreement |
| CSG Professional Services Inc | 5201 SW Westage Drive | Suite 208 | Portland | OR | 97221-0000 | Bi-Lateral Non-Disclosure Agreement |
| DataLan Corporation | 3 Barker Avenue | | White Plains | NY | 10601-0000 | Premier Partner Agreement |
| Datalogic Scanning (PSC,Inc) | 959 Terry St | | Eugene | OR | 97402-0000 | Software Support Agreement |
| Datalogic Scanning (PSC,Inc) | 959 Terry St | | Eugene | OR | 97402-0000 | Software License Agreement |
| DX Network Services | DX House, Ridgeway | Iver Bucks | | SL0 9JQ | GREAT BRITAIN | Software Support Agreement |
| DX Network Services | DX House, Ridgeway | Iver Bucks | | SL0 9JQ | GREAT BRITAIN | Software License Agreement |
| ELBA Bueroeysteme GmbH & Co KG | Maybachstr. 2 | D-45891 Gelsenkirchen | Germany | | GERMANY | Software License Agreement |
| Electronic Data Systems | 5400 Legacy Drive | | Plano | TX | 75024-0000 | Confidentiality Agreement |
| Eli Jones | 857 Winchell St. | | Portland | OR | 97217-0000 | Employment Agreement |
| Eli Jones | 857 Winchell St. | | Portland | OR | 97217-0000 | NDA & Assignment of Rights/Invention Agreement |
| ERT3WS | 3 Burospace | Bievres France | | 91571 Cedex | | Premier Partner and Master Distributor Agreement |

| Company | Address | Address 2 | City | State | Zip / Country | Agreement |
|---|---|---|---|---|---|---|
| Espero Inc. | 12641 N 70th Place | | Scottsdale | AZ | 85254-0000 | Consulting Agreement |
| Factory Software SRL | Via S Ambrogio 17 | | 27058 Voghera | | ITALY | Partner Agreements |
| Fresenius Medical Care Deutschland GmbH | Else-Kroener-Strasse 1 | | 61352 Bad Homburg v.d.H | | GERMANY | Annual Software License Agreement |
| Gimmal Group | 24 Greenway Plaza | Suite 1000 | Houston | TX | 77046-0000 | Partner Agreements |
| Gimmal Group | 24 Greenway Plaza | Suite 1000 | Houston | TX | 77046-0000 | Software License Agreement |
| Global Software Resources, Inc | 4447 Stoneridge Dr | | Pleasanton | CA | 94588-0000 | Premier Partner Agreement |
| Gus Timani | 2480 Irvine Blvd. | Apt 344 | Tustin | CA | 92782-0000 | NDA & Assignment of Rights/Invention Agreement |
| Gustavo Velez | 29540 SW Courtside | Unit 7 | Wilsonville | OR | 97070-0000 | Sub Contractor Professional Services Agreement |
| H & E Equipment Services | 11100 Mead Rd | Suite 200 | Baton Rouge | LA | 70816-0000 | Annual Software License Agreement |
| Harman International | PO Box 550 | | Farmington | MI | 48332-0000 | Software Support Agreement |
| Harman International | PO Box 550 | | Farmington | MI | 48332-0000 | Software License Agreement |
| Hospex Consulting Services | 5 C Canal Park Gulberg II | Lahore, Punjab | 54660 | | PAKISTAN | Premier Partner Agreement |
| Hostess Brands Corp. | 1 E. Amour Blvd | PO Box 419627 | Kansas City | MO | 64141-6227 | Annual Software License Agreement |
| HSR | via Olgettina 60 | | 20132 Milano | | ITALY | Annual Software License Agreement |
| Ignatius du Plessis | 609 N Acacia Drive | | Gilbert | AZ | 85233-0000 | Confidentiality, Proprietary Rights and Non-Competition Agreement |
| Infosys | Electronics City, Hosur Road | | Bangalore 560 100, India, | | | Partner NDA |
| International Foods & Frgarance - USA | 521 W 57TH St. | | New York | NY | 10019-0000 | Annual Software License Agreement |
| Intuitive | Godoy Cruz 2841 3er Piso | | Buenos Aries | | CP: c1425 FQM   ARGENTINA | Partner Agreements |
| IOX Business Solutions | 133 Alexander Street | | Crows Sest, Sydney NSW | | 2055   AUSTRALIA | Premier Partner Agreement |

| Name | Address | Suite/Apt | City | State | ZIP | Country | Agreement |
|---|---|---|---|---|---|---|---|
| ISA | Calle 12 Sur NO. | | 18-168 Medellin, Colombia | | | | Annual Software License Agreement |
| IT Systems, AG | ZwickyStrasse 7 | | Zurich-Wallestein | | CH-8304 | SWITZERLAND | Partner NDA |
| IT Workplace, LTF | 15 Wheeler Gate | | Nottingham | | NG12NA | ENGLAND | OEM License Agreement |
| IT Worx | 406 Farmington Avenue | | Farmington | CT | 06032-0000 | | Fees Due Settlement Agreement |
| Itsystems AG | Zwickystrasse 7 | CH-8304 | Zurich-Wallisellen | | | SWITZERLAND | Non-Disclosure Agreement |
| ITWorx | 406 Farmington Avenue | | Farmington | CT | 06032-0000 | | Partner Agreements |
| Janus Capital Management LLC | 151 Detroit Street | | Denver | CO | 80206-0000 | | Annual Software License Agreement |
| Janus Capital Management LLC | 151 Detroit Street | | Denver | CO | 80206-0000 | | Professional Services Agreement |
| John Kallen Konsult, AB | Fleminggatan 55 | | 11232 Stockholm | | | SWEDEN | NDA & Assignment of Rights/Invention Agreement |
| John Kallen Konsult, AB | Fleminggatan 55 | | 11232 Stockholm | | | SWEDEN | Sub Contractor Professional Services Agreement |
| Josef Leicht | 1065 E. Flamingo Rd. | Apt 1017 | Las Vegas | NV | 89119-0000 | | NDA & Assignment of Rights/Invention Agreement |
| Key2 Consulting, LLC | 1000 Peachtree Industrial Blvd | Suite 6-289 | Suwanee | GA | 30024-0000 | | Premier Partner Agreement |
| KI Business Performance GmbH | Mittlstr. 12-14 | | 50672 Cologne | | | GERMANY | Bi-Lateral Non-Disclosure Agreement |
| Knowledgelake | 3 City Place Drive | Suite 700 | St. Louis | MO | 63141-0000 | | Partner Agreements |
| Kraft Foods Global, Inc. | PO Box 795129 | | San Antonio | TX | 78279-5129 | | Software Support Agreement |
| Kraft Foods Global, Inc. | PO Box 795129 | | San Antonio | TX | 78279-5129 | | Software License Agreement |
| L'Oreal USA Products, Inc | 310 SW 4th Ave., Ste 400 | | Portland | OR | 97204-2350 | | Service Provider Agreement |
| Leigh Investments | PO Box 364 | | Vancouver | WA | 98666-0000 | | Storage Space Lease |
| Lockheed Martin Corporation | P.O. Box 650003 | | Dallas | TX | 75265-0003 | | Annual Software License Agreement |

| Company | Address 1 | Address 2 | City | State | Zip | Agreement |
|---|---|---|---|---|---|---|
| Logica, UK | 250 Brook Drive Green Park | | Reading | | RG2 GUB  GREAT BRITAIN | Confidentiality Agreement |
| Mayank Bakshi | 1058 216th Pl. SE | | Bothell | WA | 98021-0000 | NDA & Assignment of Rights/Invention Agreement |
| Miami-Dade County | Public Schools | PO Box 01-2570 | Miami | FL | 33101-0000 | Annual Software License Agreement |
| Microsoft Corp | One Redmond Way | | Redmond | WA | 98052-0000 | ISV Partner Agreement |
| Microsoft Hong Kong Limited | 13F., Cyberport 2 | 100 Cyberport Road | HONG KONG | | CHINA | Partnership Agreement |
| Minotaur Development | Darren Moore | 1244 W. Myrna Lane | Tempe | AZ | 85284-0000 | Sub Contractor Professional Services Agreement |
| Minto Group | 180 Kent St. Suite 200 | | Ontario | | K1P 0B6  CANADA | Annual Software License Agreement |
| Monsanto Company | PO Box 66900 | | St. Louis | MO | 63166-6900 | Annual Software License Agreement |
| Navantis Inc. | 21 Randolph Ave. 3rd Floor | | Toronto, Ontario M6P 4G4  CANADA | | | Premier Partner Agreement |
| Neudesic | 8105 Irvine Center Dr. | Suite 1200 | Irvine | CA | 92618-0000 | Partner Agreements |
| New Markets Management | Consulting GbR | Salomon-Heine-Weg 38b | 20251 Hamburg | | GERMANY | Consulting Agreement |
| NINTEX | 10900 NE Bellevue | | Bellevue | WA | 98004-0000 | Partner Agreements |
| Norikkon | 1218 Oxford Place | | Cary | NC | 27511-0000 | Partner Agreements |
| Norikkon, LLC | 1218 Oxford Place | | Cary | NC | 27511-0000 | Master Service Agreement |
| NPL Construction Company | 2355 W. Utopia Road | Bldg #3 | Phoenix | AZ | 85027-0000 | Software Support Agreement |
| NPL Construction Company | 2355 W. Utopia Road | Bldg #3 | Phoenix | AZ | 85027-0000 | Software License Agreement |
| Ontario Power Generation | 135 W. Beaver Creek | Richmond Hill | Ontario | | L4B 4R7  CANADA | Annual Software License Agreement |
| Pace Performance | P.O. Box 6707 | 715 NW Hoyt Street | Portland | OR | 97208-0000 | Partner Agreements |
| Patrick Theobald | Olgastrabe 15 | D-70185 | Stuttgart | | GERMANY | Confidential Settlement Agreement and Mutual General Release |

| Name | Address 1 | Address 2 | City | State | ZIP | Agreement |
|---|---|---|---|---|---|---|
| Profit Path Systems LLC | PO Box 1004 | | Milltown | NJ | 08850-0000 | Business Cooperation Agreement |
| Quantix | 428 Fore Street | | Portland | ME | 04101-0000 | Non-Disclosure and Restricted Use Agreement |
| ReadSoft | 3838 N. Causeway Blvd. | Suite 2400 | Metairie | LA | 70002-0000 | Partner Agreements |
| SAP, AG | Dietmar-Hop-Allee 16 | D-69190 | Walldorf | | GERMANY | ISV Partner Agreement |
| Sauer-Danfoss | 2800 East 13th St | | Ames | IA | 50010-0000 | Annual Software License Agreement |
| Siemens | 5800 Granite Parkway | Suite 600 | Plano | TE | 75024-0000 | Professional Services Agreement |
| Sitrion Systems GmbH | Bioherfelder Straße 251 B | D-26129 | Oldenburg | | | Confidential Settlement Agreement and Mutual General Release |
| Sterling Communications | 14945 SW Sequoia Pkwy | | Portland | OR | 97224-0000 | Service Agreement |
| Targit (U.S.) Inc. | 3450 Buschwood Park Dr. | Suite 220 | Tampa | FL | 33618-0000 | Bi-Lateral Non-Disclosure Agreement |
| Taulia | 100 Pine Street | Suite 1750 | San Francisco | CA | 94111-0000 | Partner Agreements |
| TechCFO | PO Box 8608 | | San Jose | CA | 95155-0000 | Service Agreement |
| The Glenure Group LLC | 3000 Dundee Rd., Ste 215 | | Northbrook | IL | 60062-0000 | Premier Partner Agreement |
| The Toro Company | 811 Lyndale Ave. S | | Bloomington | MN | 55420-0000 | Confidentiality and Non-Use Agreement |
| Theobald Software GmbH | Olgastraße 15 | D-70182 | Stuttgart | | GERMANY | Confidential Settlement Agreement and Mutual General Release |
| Thorogood Associates | Ealing Studios Ealing | W5 5EP, UK | | | | Non-Disclosure and Restricted Use Agreement and Product Evaluation/ Loaner Agreement |
| TIE International | Schiphol-Rijk | The Netherlands | | | | Product Evaluation Agreement |
| Todd Mackey | 226 Hill Ct. | | Castle Rock | CO | 80104-0000 | Employment Agreement |
| Todd Mackey | 226 Hill Ct. | | Castle Rock | CO | 80104-0000 | NDA & Assignment of Rights/Invention Agreement |
| Tyson Foods Inc. | PO Box 2020 | | Springdale | AR | 72762-0000 | Annual Software License Agreement |

| Name | Address | City/Region | State/Country | Zip | Agreement |
|---|---|---|---|---|---|
| UNICOR | Federal Prison Industry | PO BOX 4000 | Butner | NC | 27509-4000 | Annual Software License Agreement |
| Unternehmensberatung GmbH | Bicherfeld Straße 253 | D-26129 | Oldenburg | GERMANY | | Confidential Settlement Agreement and Mutual General Release |
| W.R. Grace | PO Box 1927 | | Lake Charles | LA | 70602-0000 | Software Support Agreement |
| W.R. Grace | PO Box 1927 | | Lake Charles | LA | 70602-0000 | Software License Agreement |
| Wipro Limited | Doddakannelli, Sarjapur Rd. | Bangalore, Karnataka 560 035, | | INDIA | | Reseller and Premier Partner Agreement |
| Wismer Consulting | 15718 NW Wismer | | Portland | OR | 97229-0000 | Partner Agreements |

Schedule <u>2.1(a)(iv)</u>

List of Seller's Accounts Receivable

[To Be Attached]

2:11 PM
08/16/11

## ERP-Link Corp.
## A/R Aging Summary
### As of August 16, 2011

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Aptar Group | 11,340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,340.00 |
| Borg Warner | 0.00 | 28,600.00 | 0.00 | 0.00 | 0.00 | 28,600.00 |
| BP Corporation of N.A. Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 8,950.00 | 8,950.00 |
| Cal Portland | 0.00 | 0.00 | 0.00 | 0.00 | 38,982.50 | 38,982.50 |
| Ceradyne, Inc. | 3,192.50 | 0.00 | 0.00 | 0.00 | 0.00 | 3,192.50 |
| Intuitive | 0.00 | 0.00 | 0.00 | 0.00 | 30.00 | 30.00 |
| IQX-BS | 0.00 | 0.00 | 0.00 | 0.00 | 1,950.00 | 1,950.00 |
| Janus Capital Management LLC | 11,393.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,393.00 |
| KCP Technologies Ltd. | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Miami-Dade County Public Schools | 0.00 | 10,500.00 | 0.00 | 0.00 | 0.00 | 10,500.00 |
| Monsanto Company | 18,126.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18,126.00 |
| Neudesic, LLC | 0.00 | 2,000.00 | 0.00 | 0.00 | 6,000.00 | 8,000.00 |
| Ontario Power Generation | 0.00 | 9,400.00 | 0.00 | 0.00 | 0.00 | 9,400.00 |
| Sauer-Danfoss | 10,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,500.00 |
| Tyson Foods Inc. | 1,374.98 | 0.00 | 0.00 | 0.00 | 0.00 | 1,374.98 |
| TOTAL | 55,926.48 | 50,500.00 | 0.00 | 0.00 | 55,912.50 | 162,338.98 |

Exhibit B
Page 40 of 42

**Schedule 2.1(a)(i)**
**Seller's Intellectual Property, Patents, Trademarks, and Copyrights**

**[To Be Attached]**

Schedule 2.1(a)(i)
Sellers Intellectual Property, Patents, Trademarks, and Copyrights

## Inventory of Software/IP per item 22

iNet Business Optimization Platform Software Suite
- 1.1. iNet.DM HTTPS ArchiveLink Adapter
- 1.2. iNet *(.NET)* Connection Service
- 1.3. Object Integrators
    - 1.3.1. BAPIs, Rfcs, custom Rfc's
    - 1.3.2. NetWeaver RFC Objects
    - 1.3.3. SAP ABAP Report Programs
    - 1.3.4. SAP Query Objects
    - 1.3.5. SAP BW InfoCube Objects
- 1.4. MS Server Adapters
    - 1.4.1. SQL Server
    - 1.4.2. SS Analysis Services
    - 1.4.3. SharePoint Doc Services
- 1.5. OI SDK's (Plug-ins to MS)
    - 1.5.1. Visual Studio 2005,2008,2010
    - 1.5.2. MS SQL Server BI Studio
- 1.6. iNet.DM Barcode Module
- 1.7. iNet.DM DSM's
    - 1.7.1. Scan.link
    - 1.7.2. Auto.link
    - 1.7.3. Auto.index
- 1.8. SAP Function Modules & Programs
    - 1.8.1. Report Integrator
    - 1.8.2. BW Security Integrator
    - 1.8.3. Auto.index Meta data Updater
    - 1.8.4. Table Viewer
    - 1.8.5. Roles & Authorization Provider
    - 1.8.6. 12 ABAP FI/SD Report Programs for CPM
- 1.9. iNet.DM SBM's
    - 1.9.1. Readsoft.index
    - 1.9.2. ApayCenter.Link
    - 1.9.3. Invoice.Link
    - 1.9.4. HR.Link
    - 1.9.5. WBS.Link
2. iNet Dynamic Apps
    - 2.1. iNet.Invoices
    - 2.2. iNet.Sales Quoter
    - 2.3. iNet.Leave Request